and our first case is 24-9519 Cedar Springs Hospital v. OSHA and going up first is Mr. Kohler. I apologize in advance for any name mispronunciations. That was exactly right. Kohler's right, okay. One for one. Good morning. Good morning. My name is Deon Kohler. I'm with the law firm of Jackson Lewis. I represent the appellate in this case which is Cedar Springs Hospital. This is an appeal from a decision of the Occupational Safety and Health Review Commission and the primary issue presented in this appeal is whether this court should follow the very recent decision by the 11th Circuit in a case called Suncoast and in that case the 11th Circuit held that the Secretary must prove that each proposed abatement is economically feasible in any case arising under the general duty clause. It is our position that the court should follow that decision for the reasons set forth in that decision. Application of the Suncoast decision to this case would result in vacating the abatements that we're contesting in this case. Under the general duty clause it's the Secretary's burden to prove that there is a recognized hazard likely to cause serious physical injury or death and a feasible and effective means of abatement which would materially reduce the hazard exists. That's the Secretary's burden. Here we have five proposed abatement measures that are being contested. We do not contest the others. The first is requiring specific staff with specialized training and security to be present on all shifts and not be given other patient care duties. Adding staff to provide adequate staffing which is not defined. Requiring Cedar Springs to provide all employees with silent personal panic alarms and reconfiguring the nursing stations in each unit to patient access. And last debriefing and tracking all near-miss incidents which is also undefined. Briefly about Cedar Springs, it's an inpatient psychiatric hospital located in Colorado Springs. It has eight units, four buildings, and a total of 110 beds. Before you move on from the proposed abatements, the Secretary proved, which one did it prove was feasible? Which one did the Secretary prove was feasible? Yeah. It's our position that the Secretary did not prove that any of those five are economically feasible. And what was it required to do to satisfy that burden of proof? There was no evidence put on as to the cost of the abatements and you can't determine if the impact, the financial impact on the operation without knowing the cost. There was what we call speculative evidence on staffing but it was insufficient to carry their burden of proof and I'll talk about that in more detail. Was that disputed? It's a fairly detailed ALJ report. Was it disputed? Well the ALJ was relying on the Pembroke decision which we believe the 11th Circuit overturned. When you say it relied on Pembroke, for what proposition? For the proposition that they did not require, it was not required to prove economic feasibility for each abatement, only one abatement measure. Okay. Which is what Pembroke said. Okay. Pembroke said you get a pass on all the others if you can prove it on one. The judge did go ahead and address economic feasibility for every abatement but it was very short shrift because one, Pembroke carried the day and two, he improperly shifted the burden to the employer to show they couldn't do it. They couldn't afford to do it. I understand. I had a follow-up question but I don't want to talk over my friend Judge Phillips. Did you have a question? Please. Isn't this whole point about Pembroke academic, right, whether they needed to or whether they thought they needed to or they didn't, the ALJ did decide that all five of these abatement measures that you are contesting were feasible. So why does it matter whether or not the ALJ academically thought, well it would have sufficed if I had only done one, you know, found feasibility on one. They found feasibility on all of them. Well that's true but the ALJ did not, it's our position that ALJ did not rely on sufficient evidence. That's a different point. Yes, that's a different issue. I see. All right. You seem to be familiar with Cedar Springs Hospital. I'm not going to spend a lot of time on that but it is important that most of the patients are involuntarily committed and there is somewhat of a misnomer and a misconception that they're all dangerous. It's a very small part of the patient population which are assaultive towards others. The greater risk of assault is self-harm with these patients. Most are admitted involuntarily. But there is a hazard of patient-on-staff violence. You concede that point. We do not contest whether or not there's a hazard. Judge Leigh Howe, a former commissioner of the Commission, went through in great detail why she thought Pembroke was not a good decision and that why the Commission should be required or the Secretary should be required to prove that economic feasibility for each proposed abatement measures. And the key parts of that was because there's no regulation of workplace violence, it relieves these proposed abatements are completely unvetted. They haven't gone through the regulatory process of allowing stakeholders in the industry, patient organizations, and various other entities, state regulatory bodies, there's lots of regulatory bodies that regulate facilities like Cedar Springs, to weigh in and give input into what's effective and what's not. Are you now segueing to your separate argument about the inapplicability of the general duty clause and your argument that the Secretary needed to impose regulations after notice and comment? No, that's really a separate argument. All right, so how does this concurrence relate to the feasibility issue which I thought you were talking about? Because if you're not going to have a regulation, the abatement should be vetted to make sure they are both economically feasible and would be effective in materially reducing the hazard. Yeah, and they don't question that, right? Well, they question it as to whether or not it's required for all the abatement measures. But I thought you just acknowledged that that's academic since the ALJ found that all five of the abatement measures you're contesting were, in fact, feasible. I guess I'm just not trying to be argumentative. I'm just trying to understand why we care about that point because it just seems academic. Well, it would be academic if you agree with the Administrative Law Judge Helms that there was sufficient evidence to prove that all of the proposed abatement measures were economic. So is it a question of harmlessness? So if we, let's, I'm just really trying to understand your argument about why it matters. So if we decide, let's say, that the ALJ was incorrect for two of the five abatement measures, that two of the five abatement measures were infeasible, three were feasible, then your argument, I guess, is that, well, we would need to vacate because we don't know whether or not the Secretary would have imposed the same penalty. There certainly would have been the same violation, but we just don't know the amount of the penalty that the Secretary would have imposed had the Secretary only found three of the five abatement measures to be feasible. Is that, is that your argument? No, I don't think it affects the penalty. We don't contest the $13,000 change. Okay, so why does it matter if, if, if, if you fail to, I guess, so if you, if you, if the Secretary is wrong in all five, I don't think anybody's going to question, well, we need to vacate the decision. But if the ALJ found sufficient evidence for some but not all of the five abatement measures that you're contesting, so tell me why, what, what the significance of that is. Well, because we could be cited with a repeat of a willful for a subsequent violation, and in light of the holding that this company is a joint, that this, they're joint employers with UHS, they have over 200 facilities around the country. The stakes are very high, and one of the problems with this after the fact, coming up with abatements after the, during the investigation by OSHA, and then citing the employer, is we don't know what we're supposed to do. Today, we don't know what adequate staffing is. It wasn't ever defined, and how are we supposed to know how many staff to add? One, add two, and what kind of staff? We have all different kinds of staff at the facility. There is a serious fair notice problem about what is it we're supposed to do to comply with the general duty clause in this unique field of workplace violence. Well, you're cited because there was a finding of, I guess, excessive workplace violence, so the aim of the abatements is to reduce the incidence of workplace violence. It seems to me that that's a bit of a math question, and we don't do, I mean, you implement the abatement, and either violence is going to go down or not, and is your client required to implement all five or seven of the abatements, or can you mix and match, or can you try one and see if it works, and go back to the Commission and say, staffing solved our problem, therefore we're not going to implement the other ones? Can all that happen? It's a very good question, because the 11th Circuit addressed that, and because the Secretary of that case argued that these are not mandatory. You don't have to do them all, so what's the harm here? And the court rejected that and said they're exposed to serious liability as a result of coming back and saying, well, you should have tried this, but you didn't try this, or you should have done this in a different way. You know, as we cited in our brief and went through just the staffing issue, OSHA's been all over the place in terms, and it's not the staffing issue, the security issue. OSHA's been all over the place in terms of defining what these security people are supposed to look like, what do they do, whether they can perform other things, so it's all over the place. But are you overstating it a little bit, because it's pretty simple at its bottom, which is you have X number of patient on staff violence jumping over nursing station guard rails, whatever else. The problem is identifiable and observed, and so when you are given these abatement considerations factors and told they're not exclusive, you can also use your own judgment to solve this problem. So long as you solve the problem and you materially reduce the hazard, do you really fear some sort of liability? Everyone's happy if you solve the problem, aren't they? Well, it's a problem that can't be eliminated. It has to be what's an acceptable level of workplace violence. Nobody knows the answer. But we know what's unacceptable, and that's the number that was found in this case. Well, and it didn't go by pure number. That was evidence of a recognized hazard, because the dart raids which measure days away from work and restricted duty that OSHA uses to compare facilities doesn't have a separate category where you can compare our facility to one that's like it. It's a category with lots of facilities lumped in that are very different, provide different services under different circumstances with a different patient population. Well, are you saying we're doing as well as we can and we meet the standard already? No. Okay. I'm not saying that. So where are we then? Well, where did they prove their case? And it's our position they did not. They're certainly free to propose these abatements, but they're standards of what they must prove to bind us to that abatement, and that didn't happen in this case. Are we bound by fact-finding here? No, it's not. I don't think it's finding a fact. I think it's a conclusion, because to conclude that each abatement is economically feasible, the underlying facts are facts. Isn't feasibility a fact question? No, I think it's a conclusion of law, because it was a conclusion based on expert testimony without proper foundation and without proper cost information or information about profitability of the facility. For example, I do want to make this one point, because I'm running out of time. There was no evidence. The evidence on profitability of the facility was that it could add staff, undetermined number, and still be profitable. But what was missing from that calculation, because there were no experts who gave testimony of economic feasibility, was what is an acceptable profit level in a behavioral health facility? And that's what has happened in other OSHA cases, where economic feasibility was proved by comparing what is profitability, like Beverly Enterprises as an example. What is an acceptable level of profitability? Is it 1%? Is it 10%? Is it 20%? And you're saying that would be the correct methodology? That's right. You would do proper expert with proper foundational evidence using a proper methodology under Daubert in order to prove that element. And that wasn't done here? That wasn't done in this case, on any of the proposed amendments. Thank you. Let's hear from the government. Good morning, Your Honors. My name is Leigh Ann Shriver, and I represent the Secretary of Labor. This case concerns the endangerment of the lives and well-being of workers at an inpatient behavioral health facility, where the employer failed to adequately abate the recognized hazard of workplace violence. I will begin by briefly discussing the general duty clause violation and the evidence supporting that, and then I wish to turn to the question of preemption, which the Secretary has briefed for the first time before this court. The general duty clause requires that employers abate recognized hazards to the extent feasible, and that's an ongoing obligation. When OSHA issues a general duty clause citation, it includes a list of abatement measures in that citation that demonstrate that there was something the employer could have done to materially reduce that hazard, but the employer is not bound to use those particular abatement measures, either before the citation or after the citation. Rather, Commission case law is clear that they can choose any abatement measures that reduce the hazard to the extent feasible. Even if it were not one of the seven abatement items identified in the citation? Correct, Your Honor. For example, getting radios, even if they're not silent alarms? Correct, Your Honor. If they can show that that adequately abates that hazard and that the use of any other abatement measure would not additionally materially reduce the hazard. And then how do you define success, or how will Cedar Springs know that it's succeeded in satisfying the Secretary? Cedar Springs has complied with its obligation under the general duty clause if it has done all of the measures that are feasible for it to do, if any additional measures that it can do would not materially reduce the hazard, or no significant hazard remains. So are you saying even if Cedar Springs adopted all seven of those abatement matters, abatement components, that they still would, you know, whether or not they were in compliance, if there were other things that the Secretary hasn't even identified, that they haven't explored? For example, radios or something like that? Surely not. That's the nature of the general duty clause, Your Honor. So your argument is that you can issue a citation to Cedar Springs to say, these are the seven things you should do. They do all seven of those things, but then later the Secretary comes in and says, you know, you also should have given them not only the silent alarms, but the radios. And you shouldn't have one security guard on staff during overtime and in the evenings, but you should have two. Are you saying that they could still be in violation of the general duty clause if they do literally every single thing that were cited to them? Your Honor, the purpose of the abatements listed in the citation is to meet the Secretary's burden of proof when it's contested, which is to show that there was something the employer could have done to materially reduce the hazard. Now, that could be, it could be that they have to do 20 things in order to do that. And the Secretary here met her burden by showing that these abatement measures were available. But Cedar Springs has an obligation to keep an eye on its facilities. So your answer... Yes. Okay, that's what I was looking for. Your answer is yes. And that's because of the nature of the general duty clause. This is an ongoing obligation. I think it's important to think about the fact that even if the Secretary says these seven abatement measures, they put them all in place, they've adequately abated it, three weeks later something different happens in the facility and they notice that, they have an obligation to identify that hazard, implement an abatement that addresses it. And you do have the burden to show that these abatement components are feasible, correct? Yes, Your Honor. Now, I want to ask you how in the world you can do that under your interpretation of the Security staff would reduce their profit by 25 percent. It's a hypothetical. Second, if they reconfigure all of the nurses stations in the units, then that would reduce their profit by, say, 35 percent. Okay? So now we've got a reduction of 60 percent. And then we reduce the... and we provide a silent alarm to all of the MSH, the mental specialists, and that reduces their profit margin by, say, 35 percent. Now it's 95 percent. So they have still would be able, theoretically, to maintain a 5 percent. And then they decide, oh, well, we have to provide, you know, so the other two components of the abatement measures, that would reduce our profit by 10 percent. So now they're operating at a loss. And then... but they still don't even know, even if they continue to operate at a continuing loss, if that's going to satisfy the Secretary, because they still don't know whether or not you're going to say after the fact, no, you really should have provided radios in addition to the silent alarms. You really should have provided two security staff. We didn't say those seven were sufficient. That's for you to determine after you do everything. How in the world did the evidence that you presented through Dr. Lipscomb and Dr. Foreman and all of the other evidence of the other abatement measures at the other psychiatric facilities, how in the world did that actually satisfy feasibility if that is what they were obligated to do? So the Secretary's obligation is to show that there is at least one thing that would have been feasible and effective for them to do that could have materially reduced the hazard. If there's a subsequent case where, let's say, this issue comes up again, we then re-enter the question of, well, is that economically feasible now? They get a second chance at proving whether or not it's economically feasible in the future. So as long as we show that one of these measures is economically feasible, that's sufficient to show that they violated the general duty clause. And I'll note that they do not contest two of these abatement measures and this court can affirm the general duty clause violation on the basis of those two uncontested measures. Doesn't that give some force to their fair notice argument that, you know, that you're not willing to be pinned down on, you know, and even after the fact you can say, well, you should have done additional abatements, as Judge Bacharach was suggesting. You know, why isn't that, I mean, they really don't know what they need to do to satisfy the secretary. And, you know, like Sunco's recognized the exposure and the vulnerability to the company if there's a moving target. Why isn't there some force to the notice argument? Your Honor, courts and the Commission have found that there is not a fair notice problem where the hazard is recognized and a reasonably prudent employer in the industry would have known that they needed to implement the abatement measure. And here it's clear that Cedar Springs themselves knew that they had to implement many of these abatement measures, including on the staffing issue. They knew that they needed to be staffing according to patient acuity and they were not doing so. They were denying staff requests for additional staff due to patient acuity. They were in some cases staffing below the grid. So this employer knew what they were supposed to do and, as we showed, it was economically feasible for them to do it and they did not do so. You're saying the legal standard is essentially a reasonably prudent employer? Yes, Your Honor. And then after that it becomes a fat question as to what the appropriate abatement should be? Yes, and multiple other courts in the Commission have found that there is not a fair notice problem with the general duty clause as applied. If Your Honors have no further questions on the general duty clause issue. When you say that, what if we had a question about feasibility? Can you elaborate on that question? I'll just really ask it. I don't want to interrupt your train of thought, but I did have a question about feasibility. On the general duty clause? Well, I'll just ask it. Yeah. Okay, rather than waste more time. You have the burden to show feasibility, right? Yes. And then on page 108 of the ALJ's decision, the ALJ said that, no, it's an affirmative defense to show economic infeasibility. Isn't that completely inconsistent with your position that the ALJ had recognized that it was the Commission's burden to show feasibility? Your Honor, the ALJ had first gone through all of the evidence the Secretary had provided with regard to economic feasibility and found that it met the Secretary's burden, and then noted that Cedar Springs didn't provide rebuttal evidence. But that's not what the ALJ said. The ALJ said it's an affirmative defense that was incumbent on Cedar Springs to raise that. It is still an affirmative defense before OSHREC, but I think the ALJ did do the analysis of determining that there is economic feasibility here based on the Secretary's evidence. Well, but yeah, I mean, yeah, definitely the ALJ found feasibility. The question is whether or not the ALJ found feasibility under the correct burden, placing the burden on the right party. ALJ certainly, you know, can say, okay, whether it was these abatement measures were feasible, but you got a problem if the ALJ made that determination under the wrong standard or placing the burden on the wrong party. I don't think the ALJ did that, Your Honor. But how do you reconcile that with page 108? I think the ALJ acknowledges, because of the nature of Cedar Springs' argument, that they could have raised it as an affirmative defense, or they could have provided rebuttal testimony to the Secretary's evidence, and they didn't do either. Okay, let's say that that's what they had to admit. Does that make any sense to you? So usually economic infeasibility as an affirmative defense is used in standards violations where we don't have this second part where the Secretary has to affirmatively show feasibility, so that logic is usually applied in a standards violation and isn't as useful here. Well, not only is it not useful here, it's internally inconsistent. You know, if I say, you have the burden to show X, and then I turn to your adversary and say, well, you have the burden to show X, how does that make any sense? It's the same thing, economic feasibility. One of you have the burden and the other one doesn't have the burden. And the ALJ said both of you have the burden. I think the ALJ noted that both parties can provide evidence, and in some cases employers use an affirmative defense. I agree that that was not ideally stated because that's more relevant in standards violation cases, but I think substantial evidence does support, under the correct burden, the ALJ's determination of economic feasibility here. And before I turn to the question of preemption, I just want to note that Cedar Springs does mischaracterize both Commissioner Layhouse's concurrence and the Suncoast case is not the case that either of them suggested that the Secretary has to prove feasibility and efficacy for all of them, but rather Commissioner Layhouse's concurrence identifies the fact that it is useful for employers if the Commission exercises its discretion to evaluate the feasibility and efficacy of all of these abatement measures, which the ALJ did do here. If Your Honor's have no further questions, I will turn to the issue of preemption in my remaining time. As an initial matter, Your Honor, Cedar Springs waived its preemption argument here because it is an affirmative defense and they did not raise it prior to trial. The Commission has long held that this is an or be one as a statutory exemption under the plain language of the OSHA, because that provision begins, nothing in this act shall apply to clear language of a statutory exemption. Similarly, it is comparable, it is an issue of preemption, we talk about as preemption colloquially, because it is similar to federal preemption of state law where one governmental entity taking action can take precedence over another governmental entity's action or ability to enforce its own rules or laws. And both statutory exemptions and preemption are treated as affirmative defenses. It's not appropriate to consider this a jurisdictional question because that issue, the term jurisdictional question, as that is used to mean questions that may not be waived by parties and that the court can raise sui sponte, refers to questions of the court's own jurisdiction to hear questions of subject matter jurisdiction. And this is not that. No one is contesting that this court does not have authority to hear this question and rather it's a question of whether the act applies. The CMS regulation does require adequate staffing. Why isn't that a direct conflict with the Secretary's position? Yes, Your Honor. The actual language of the requirement for staffing is that the hospital must have adequate numbers of qualified professional and supportive staff to evaluate patients, formulate written, individualized, comprehensive treatment plans, provide active treatment measures, and engage in discharge planning. That's the CMS? Yes. And those are all patient care activities. Nothing in that says that there must be adequate staffing to ensure that workers are safe from workplace violence. And it is at best tangentially related as a minimal exercise of authority, which the Supreme Court in Chowky-Mallett Bay found was insufficient to preempt OSHA. Additionally, CMS does not have the form of statutory authority necessary to preempt OSHA. Their statutory authority rests on patient care, patient health, and safety. And the Commission has found that workers have to be within the population Congress intended to protect in order for another agency to preempt OSHA. Additionally, a finding of preemption here would be contrary to the statutory purpose of the OSH Act because it would leave a patchwork set of regulations governing this industry and would result in a large number of workers in the healthcare industry with no meaningful protections from workplace violence. I see that I'm almost out of time, so if the Court has no further questions, the Secretary asks that this Court affirm all of the ALJ's findings with regard to the general duty clause and find that Cedar Springs has waived their preemption argument or that CMS does not preempt OSHA. Thank you. Thank you. Mr. Fuller, would you like 60 seconds? There's so much there, it's hard to cram in 60 seconds. Give it your best shot. I will. I thought, you know, the questioning, the points were made for me to the most, for the most part, it is not adequate to, we're caught in this catch-22 of, okay, do all these things, we'll come back and inspect you in six months, and there were some more injuries, there were some more incidents, so you could have done this, you could have had whatever. Although, to be fair, the, you know, the Umbrella Corporation here has a lot of other involuntary treatment facilities right around the country, so it's not like there's, you know, best practices or some are doing better than others where you might get a clue as to what works and what doesn't work. Well, they do that, and the facilities are very similar in terms of treatment of patients, so that, and I do want to make the point that they do have best practices, but OSHA said they were not adequate, and some of that was a process, was a fault of implementation, which we fixed post inspection. Others are just coming up with after-the-fact abatements, which are not feasible or materially effective. They didn't carry their burden of proof on either of those by showing proper comparatory evidence of, okay, it was done at these group of hospitals that were studied. They had five security guards, and it resulted in a reduction in patient-on-staff violence of 15%. There's nothing like that. It's all speculative. We don't even know if it would be effective. We don't know if it would agitate patients further to have to have security guards in the facility. These are people who are had conflicts with law enforcement, and I did want to make one last point quickly, and that point is clinical treatment is the most effective means of abatement. Getting patients properly medicated, properly diagnosed, and properly treated as CMS says we should do, and the state of Colorado says we're required to do, is the most effective way to mitigate a risk to our staff that a patient wants. I don't think anybody disagrees with that. Thank you, counsel. We appreciate your arguments. Your excuse in the case is submitted.